The **POSTER EXCHANGE, INC.,** Plaintiff-Appellee-Cross Appellant,

v.

**NATIONAL SCREEN SERVICE CORPORATION,** Defendant-Appellant-Cross Appellee.

No. 27902.

United States Court of Appeals,
Fifth Circuit.

Aug. 24, 1970.

Charles A. Moye, Jr., E. Smythe Gambrell, Atlanta, Ga., Walter S. Beck, New York City, for appellant.

Glenn B. Hester, Carl E. Sanders, Augusta, Ga., Francis T. Anderson, Yeadon, Pa., C. Ellis Henican, Jr., New Orleans, La., for appellee.

Before JOHN R. BROWN, Chief Judge, AINSWORTH and GODBOLD, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Here we write again in this seemingly ceaseless saga of antitrust litigation [1] between the local distributors of motion picture advertising accessories [2] and the vertically integrated single producer and national distributor of the accessories, National Screen Service Corporation. This chapter, the Atlanta phase, has ben elaborated by three previous opinions of this Court.[3]

---

1. This Court has recently written in the New Orleans phase of this litigation and there chronicled some of the history of the litigation and the industry involved. Exhibitors Poster Exchange, Inc. v. National Screen Service, Corp., 5 Cir., 1970, 427 F.2d 710. The most complete history of this industry is, however, set out in Lawlor v. National Screen Service, Corp., 3d Cir., 1959, 270 F.2d 146, cert. denied, 1960, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742. See also Lawlor v. National Screen Service Corp., 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122; Vogelstein v. National Screen Service Corp., E.D.Pa., 1962, 204 F.Supp. 591; Lipp v. National Screen Service Corp., E. D.Pa., 1960, 188 F.Supp. 245; Poster Exchange, Inc. v. National Screen Service Corp., N.D.Ga., 1963, 35 F.R.D. 558,

aff'd, 5 Cir., 340 F.2d 320; National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir., 1962, 305 F.2d 647.

2. "Standard accessories" consist principally of lithographed posters, large and small, and photographs of scenes from a motion picture, which along with window cards and other similar articles, are displayed in and about theatre lobbies and on billboards in order to stimulate public attendance at a current or future exhibition of a motion picture.

3. The previous appearances of this case in this Court were:
Poster I: National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir., 1962, 305 F.2d 647, in which this Court in an opinion written by Judge Gewin affirmed the District Court's denial of

The plot of this chapter revolves around monopoly—§ 2 of the Sherman Act.[4] Poster claimed that National Screen used its position as the only producer and supplier of standard accessories for motion pictures to "monopolize" the Atlanta area market for the distribution of the accessories to movie exhibitors. Poster alleges two separate acts of monopolization. First, it claims that as far back as the statute of limitations can reach, here it is assumed that that is July, 1957, National Screen refused to provide Poster with an adequate supply of accessories, refused to grant Poster a sublicense, and priced the accessories that were provided at the same price that National Screen distributed material to the exhibitors—the "over-the-counter" price. The second claim was that in 1961 National Screen completely refused to continue supplying any accessories to Poster.

The case was tried without a jury and the District Court found that there had been monopolization and assessed damages of $150,000, tripled pursuant to 15 U.S.C.A. § 15[5] to $450,000. It also awarded attorney's fees of $50,000 to Poster Exchange. National Screen attacks the District Court's finding of liability, finding as to the amount of damages, and the amount of attorney fees awarded. Poster Exchange contends that the amount of attorney's fees awarded was inadequate. We, however, reject all of these contentions. But we remand for additional consideration of the amount of attorney's fees.

## I.

The history of this industry-wide dispute has been set out several times by many Courts, including this one, and need not be restated here. (See note 1, *supra*).

National Screen is the sole holder of a license to produce and to distribute standard accessories for the large domestic movie producing companies.[6] It obtained this position after a substantial number of firms were already in the business of marketing the accessories to motion picture exhibitors. Poster is a local distributor-jobber in the Atlanta area.

Without specifics and details reflected in the numerous prior opinions, the claim made here took this shape. Prior to 1940 the major domestic motion pic-

National Screen's motion for summary judgment and Poster Exchanges motion for preliminary injunction and said there were issues of fact to be resolved;

Poster II: Poster Exchange, Inc. v. Paramount Dist. Corp., 5 Cir., 1965, 340 F.2d 320, in which this Court affirmed the District Court's summary judgment in favor of the film producing companies; and

Poster III: Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir., 1966, 362 F.2d .571, in which this Court, in an opinion written by Judge Tuttle, reversed the District Court's summary judgment in favor of National Screen.

4. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C.A. § 2.

5. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C.A. § 15.

6. The production companies for which National Screen produced and distributed accessories are Paramount Film Distributing Corporation, Warner Brothers Pictures Distributing Corporation, Universal Film Exchange, Inc., Columbia Pictures Corporation. United Artist Corporation, 20th Century Fox Film Corporation, as well as RKO and Loew's.

ture producers produced and distributed standard accessories through local distributor-jobbers in major cities. Between 1940 and 1947 National Screen was licensed[7] by the producing companies to be the exclusive producer-distributor of standard accessories and to distribute them on a nationwide basis.

Armed with the exclusive licenses National Screen in 1943 bought out 28 of the local distributor-jobbers. In 1943 Philadelphia area jobber-distributors brought an antitrust action—the "Allied Suit". Shortly thereafter it was settled and National Screen agreed to sublicense the plaintiffs in that action and did grant them and some others sublicenses. But even though Poster began making requests for such a sublicense as early as 1943 and made this request repeatedly, National Screen refused to grant it a sublicense. Meanwhile National Screen had entered the Atlantic Exchange Market. During this period National Screen did, however, supply Poster with accessories, but only in limited quantities, not enough for Poster to supply its customers. The prices charged were substantially higher than those paid by other sublicenses. In fact the prices were the same that National charged the other exhibitors—the over-the-counter prices.

About 1950, when the original exclusive licenses from the producers had expired, National Screen entered into nominally nonexclusive agreements with all of the producers. These agreements, however, contained a type of "Most Favored Nation Clause" that prohibited the producer from granting other licenses unless the prospective licensee agreed to establish a nationwide distribution system like that of National Screen and agreed to a full line production of accessories.

In 1954 the United States filed an antitrust action in the Southern District of New York (see note 10, *infra*). And pursuant to a consent decree of 1957, National Screen considered itself obligated to continue to grant sublicenses.[8] The nominally nonexclusive provision of the license from the producers was also retained. Although during these years Poster had survived without a sublicense, its market share declined drastically. In about 1942–43 it had about 60% of the market in the Atlanta area, but by 1961 its share had declined to only 24%. In these years National Screen's share, which was zero when it started, rose to over 70%. In 1961 National Screen leveled its final blow. It adopted a nationwide policy under which it refused to provide accessories to any distributor-jobber. Following this, Poster's share of the market fell to 2%. In 1957 it had 200—225 customers; in 1961 it had 15.[9] The District Court found that National Screen's pre-1961 acts of refusing to provide an adequate supply of accessories and charging "top prices", as

---

7. In 1940 National Screen obtained an exclusive license from Paramount and RKO. In 1942 such a license was obtained from Loew's, Inc. and the other big domestic producers were soon distributing standard accessories through National Screen:

| | |
|---|---|
| Universal | August 1, 1944 |
| Columbia | April 12, 1945 |
| United Artists | January 21, 1946 |
| Warner | March 22, 1946 |
| Fox | July 1, 1947 |

8. The Consent Decree does not specify under what conditions National Screen was to deal with distributor-jobbers. But it is very clear that it considered itself obligated for a year—another unspecified limitation.

9. Keeping the figure of the trade, Poster, in a verbal "trailer", has amply stated the essence of its two real claims:

"It appears from the evidence that the defendant effectively stifled the plaintiff's business by degrees. First, entering exclusive contracts with the major producers, followed by refusal to grant a sub-license to the plaintiff to deal in standard accessories, followed by tactics making it difficult and impossible for the plaintiff to buy adequate supplies over-the-counter from the defendant, and finally, on May 16, 1961, by absolutely refusing to make any supplies whatever available to the plaintiff at any price, this being the final crowning blow."

Poster's Brief, p. 47.

well as the 1961 complete refusal to deal, occurred and were motivated by the intention to drive Poster out of the market.

## II.

National Screen presents three challenges to the District Court's findings and conclusions. In the first, a double-feature, National Screen argues that liability is prohibited by the 1957 consent decree entered in the Government antitrust suit [10] and because Lawlor v. National Screen Service Corp., 3 Cir., 1959, 270 F.2d 146, cert. denied, 1960, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 is controlling. These contentions have, however, been presented to this Court twice and have been rejected twice, first in Judge Gewin's 1962 opinion in Poster I and again in Judge Tuttle's opinion in Poster III in 1966. (See note 3, *supra*). We reject them thrice.[11]

■ Second, National Screen contends that Poster in pretrial response to a discovery request and in its pleadings, had made admissions that precluded imposing liability for pre 1961 acts. But we think it is plain that the District Court did not read these as reflecting a final, absolute judicial admission; nor do we. At most they related solely on the ultimate issues as just a few more pieces of evidentiary footage, which the District Court could, but was not required to credit. As a last reel, the whole trial would have been a waste. That De Mille epic would not have been carried out if anyone, including the Judge, had believed that Poster Exchange after years of protest was now telling the Judge that until 1961 everything was rosy.

■ National Screen's third contention, which is closely related to the second, is that the District Court's fact findings upon which the conclusion of Sherman Act liability is based are not supported. But this challenge begins with the heavy burden of F.R.Civ.P. 52(a)'s clearly erroneous standard. Lawlor v. National Screen Service Corp., 3 Cir., 1959, 270 F.2d 146, 152, cert. denied, 1960, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742. This greatly simplifies our quest. There is direct testimony of present and former employees of Poster Exchange as well as testimony of former National Screen employees that prior to 1961 National Screen had restricted the number of accessories available to Poster and priced the accessories that were supplied at a "top price". The testimony also showed that this, as well as the 1961 complete refusal to deal, was done with the intention of driving Poster out of the market.[12] On this approach we think that there was quite enough to warrant the District Court's fact finding.

---

10. The Consent Decree was entered in United States v. National Screen Service Corp. (civ. action 17–138, 1957 C.C.H. Trade Cases ¶ 68,670).

11. As to the 1957 decree we do not believe that either United States v. Borden Co., 1954, 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903; Sam Fox Publishing Co., Inc. v. United States, 1961, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604; K–91 Inc. v. Gershwin Publishing Corp., 9 Cir., 1967, 372 F.2d 1, cert. denied, 1968, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838; or other cases referred to by National Screen support the position that this consent decree had nationwide res judicata, collateral estoppel effect on persons who were not parties or involved.

12. There is no doubt that the general rule requires a finding of specific intent to monopolize. See Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir., 1962, 305 F.2d 647. And we have such a finding here. But we also have a finding that a monopoly would result from National Screen's conduct. As the Court said in United States v. Griffith, 1948, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236, 1242, it is "not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the antitrust laws had been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangement."

These three challenges are really previews. The main feature here is National Screen's argument that even on the facts found there can be no § 2 liability. The review of that argument starts with the central element of the plot National Screen was the only producer of standard accessories. During the period for which liability is asserted, National Screen's licenses from the producers were only nominally non-exclusive.[13] National Screen certainly had, as the District Court found, monopoly power within all conceivable market conditions. In order for another company to have acquired a license it would have had to make a multimillion dollar investment. The producing companies required under their "Most Favored Nation" clauses required nationwide distribution facilities, full line producing and direct competition with National Screen's already established organization. Moreover, Poster was only a local distributor-jobber. And the District Court was entitled to conclude that Poster cannot be required to convert the nature of its business, make a multimillion dollar investment and become a nationwide distributor just to survive in the Atlanta area. See United States v. Aluminum Company of America, Inc., 2 Cir., 1945, 148 F.2d 416.

The District Court's fact finding, which comes under Rule 52(a)'s clearly erroneous umbrella, was that National Screen intentionally used the monopoly power it had at the manufacturing level to eliminate Poster as a competitor at the distributor-jobber level. Such conduct has long been held to violate § 2.

This is just the type of evil that the prohibitions on tying and other such per se violations are aimed at. As Mr. Justice Clark said in Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 611, 73 S.Ct. 872, 881, 97 L.Ed. 1277, 1291, "the essence of illegality * * * is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next."

Moreover, the Supreme Court has long ago condemned a vertically integrated manufacturer-retailer from using its power at one level to drive out competition at another. In Eastman Kodak Co. v. Southern Photo Materials Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, a retail distributor of photographic equipment brought a private antitrust action seeking recovery under § 2. The jury found that Eastman had refused to continue selling photographic equipment to plaintiff at a wholesale price and that Eastman's activities were motivated by a desire to eliminate plaintiff as a competitor in the Atlanta retail market. The Supreme Court held that there had been a § 2 violation.

National Screen was found to have engaged in the same kind of intentional monopolistic conduct. And this conduct cannot be defended on the ground that it was only the exercise of legitimate business judgment. National Screen did introduce an accounting analysis that indicated that in the years preceding[14] 1961 it did sustain nationwide losses in its Standard Assessory Division.[15]

13. National Screen acquired its position as the sole producer of standard accessories for motion pictures produced by the major domestic producers in the 1940s under exclusive contracts. We do not pass on the legality of those exclusive dealing contracts. See *Lawlor, supra.* It is enough here that National Screen had monopoly power at the manufacturing level and used it to prevent competition at the distributor-jobber level. As the Court said in United States v. Griffith, 1948, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236, 1243, it "follows a

fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful."

14.  1959    $161,200
     1960    $ 84,058
     1961    $244,900

15. There was evidence that indicated that in some licenses from some producers there were percentage-of-profits provisions under which National Screen did, however, continue to make payments to

But National Screen for its own inarticulated reasons stayed in the business,[16] either as a loss leader, feeder, or for whatever reason. And the District Court was entitled to infer that National Screen's decision to stay in the standard accessory business even in the face of losses indicated that its decision to stop dealing with distributor-jobbers was not "dictated by sound business policy." And there was no evidence that dealing through distributor-jobbers was more expensive than dealing directly with the exhibitors. Nor was there any indication that efficiency could be improved by dealing directly. *Times-Picayune, supra.*

There can be no doubt that becoming a complete monopoly may improve a business' financial condition. But becoming a monopoly simply to make more money is not a "legitimate business justification" for "monopolizing".

## III.

National Screen's objection to the amount of damages assessed also must overcome the high hurdle of the Rule 52(a) clearly erroneous standard. And here that standard is raised even higher by the well established rule that although the fact of injury must be certainly proved, the amount of loss, because of its very nature, can be estimated on any reasonable basis. Eastman Kodak Co. v. Southern Photo Materials, supra; Bigelow v. RKO Radio Pictures, Inc.,

1945, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

National Screen's basic argument about the amount of damages is that Poster was entitled to recover damages only from the time of the complete refusal to deal in 1961.[17] In final analysis, however, this contention rests on the argument that Poster had by pretrial admissions abandoned its theory of liability for the pre-1961 acts and on the argument that the District Court's findings of fact regarding this period are not supported by the record. We have of course rejected both of these contentions. Thus on the findings we have credited that Poster was entitled to recover damages for that wrong as well as for injury resulting from National Screen's complete refusal to deal in 1961.

Our assaying the reasonableness of the $150,000 in damages found by the District Court can be based on the formula— a comparison of the net receipts of the parties—Mr. Justice Stone set out in *Bigelow, supra.* For there is no doubt that there was ample basis for using that formula here.[18] And it is clear that use of the *Bigelow* formula is not precluded by Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 5 Cir., 1967, 383 F.2d 97, cert. denied, 1968, 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870, referring to it. Under the *Bigelow* formula the District Court might have awarded a sum

producers from its Atlanta operation. We do not, however, consider these payments the basis for the District Court's finding nor of central importance here.

16. After the 1961 decision to stop dealing with distributor-jobbers became effective, losses as computed by the accounting firm relied on by National Screen went up.

| | |
|---|---|
| 1962 | $381,056 |
| 1963 | $415,933 |
| 1964 | $523,511 |

17. Damages were claimed up to the time this suit was filed in the summer of 1961.

18. There is no surmise or conjecture about the applicability of *Bigelow*. There was an established business with a substantial part of the market and that business was a profitable operation. That operation, however, became less and less profitable while National Screen, which started from nothing, captured most of the market by predatory practices. And there can be no doubt that National Screen and Poster had similar relations with exhibitors and were certainly handling fungible goods.

quite in excess of $150,000 in actual damages.[19]

In view of the grossly predatory practices engaged in by National Screen and the fact that Poster's once substantial business had been almost destroyed, certainly the $150,000 awarded was not excessive.

## IV.

■ Both National Screen and Poster Exchange are dissatisfied with the amount of attorney's fees awarded. National Screen claims the $50,000 awarded is grossly excessive while Poster claims it is completely inadequate and requests that the award be increased by $100,000. At the outset we think the services were worth at least $50,000 for work done at the District Court level and we affirm the District Court's award as a floor. See Grigsby v. Coastal Marine Service, 5 Cir., 1969, 412 F.2d 1011, 1042. We believe that this matter should be remanded for consideration of factors, which we apprehend were perhaps not given appropriate consideration or weight by the District Court.[20] The District Court should consider the time, difficulty, and perseverance required to succeed against such formidable, resourceful opposition to determine whether the $50,000 award should be increased. Independently of the fee fixed for work at the District Court level, the Judge should also fix the fee for all of the appellate work including that done on the instant appeal. He should take into account all of the factors including those briefly summarized here. Although National Screen contends the case is simple, it required 111 pages for its pre-argument briefs and it has also filed a post-

argument brief. Counsel for Poster was required to respond at length and here it might be appropriate to repeat, moreover, that this is the fourth time this case has been in this Court. We feel that this is the time to compensate the attorneys for the tenacity displayed in this litigation.

Affirmed in part and remanded in part.

| 19. | Poster Exchange | National Screen |
|---|---|---|
| Gross Receipts | $264,297 | *$929,245 |
| Cost of inventory | $1⁴5,005 | $492,500 |
| Net receipts | $119,292 | $436,745 |

*Atlanta Exchange area only.

20. We do not put this in terms of abuse of discretion. Abuse of discretion is undoubtedly the proper standard for review, not artificial percentage of the single damages. See W. W. Montague & Co. v. Lowry, 1904, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Volasco Products Co. v. Lloyd A. Fry Roofing Co., 6 Cir., 1965, 346 F.2d 661, cert. denied, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157.