**MORRIS COMMUNICATIONS CORPORATION, a Georgia Corporation, Plaintiff,**

v.

**PGA TOUR, INC., Defendant.**

**No. 3:00–CV–1128–J–20C.**

United States District Court, M.D. Florida, Jacksonville Division.

Oct. 23, 2000.

George D. Gabel, Jr., Timothy J. Conner, Jerome W. Hoffman, Holland & Knight LLP, Jacksonville, FL, for Morris Communications Corp., a Georgia Corporation, plaintiff.

Gregory F. Lunny, James M. Riley, Rogers, Towers, Bailey, Jones & Gay,

Jacksonville, FL, Jeffrey A. Mishkin, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for PGA Tour, Inc., defendant.

## ORDER

SCHLESINGER, District Judge.

Before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. No. 2, filed October 11, 2000), to which the Defendant has filed a Memorandum in Opposition (Doc. No. 15, filed October 17, 2000). On October 18, 2000, the Court heard oral argument on the Motion. In their respective memoranda and supporting arguments, the parties have advanced competing theories of antitrust and intellectual property law. As explained more fully herein, resolution of both the instant Motion and the underlying controversy will require an examination of both bodies of law and their proper application in a rapidly changing world.

## I. Background

Defendant PGA Tour, Inc. is a corporation mainly engaged in the business of promoting professional golf tournaments throughout North America, collectively known as the PGA Tour. Players on the PGA Tour, generally recognized to be among the best golfers in the world, assign all television, radio, motion picture and other rights related to PGA Tour events to Defendant, and with limited exceptions, are restricted from competing in tournaments sponsored by other entities. Plaintiff in this case has submitted affidavits stating that the PGA Tour is the most widely recognized professional golfing tour in the United States, and that although there are other golf tournaments which generate fan interest, there are no effective substitutes for the PGA Tour.

PGA Tour events are covered extensively by a number of different print, broadcast, and electronic media organizations. Although these events are conducted on private golf courses, Defendant issues credentials to members of the media who are thereby invited to its tournaments for the purpose of providing media coverage. One such media organization that covers the PGA Tour is Plaintiff, which is engaged in the business of publishing news, including news transmitted over the internet. Both Defendant and members of the media, including Plaintiff, benefit from this arrangement in that the media are better positioned to satisfy the public's demand for golf-related information, and Defendant enjoys enhanced publicity, which in turn generates greater demand for its golf tournaments and related goods and services.

The crux of the controversy in this case involves a relatively new form of internet-based information known as "real-time" scores. Real-time scores, as the term suggests, are scores that are transmitted over the internet contemporaneously, or nearly contemporaneously, to their being gathered and recorded at one central location on the golf course. In this way, internet users are able to track during a golf tournament each participating player's progress on a hole-by-hole basis. In order to facilitate transmission of the real-time golf scores over the internet, Defendant has designed and implemented an electronic relay system called the Real–Time Scoring System ("RTSS"). According to affidavits submitted by Defendant, it has invested in excess of $26,000,000 to date in developing and operating RTSS.

The system basically works as follows: During a given golf tournament, volunteer workers known as "hole reporters" follow each group of golfers on the golf course and tabulate the scores of each player at the end of each hole of golf played. The scores are then collected by other volunteers located at each of the 18 greens on the golf course, who, with the aid of hand-held wireless radios, relay the scoring information to a remote production truck staffed by personnel employed by Defendant. The scores of all participating golfers are then processed at the remote production truck and transmitted by Defendant to its web-site, *pgatour.com.* At the same time, real-time scores are also transmitted to an on-site media cen-

ter where members of the media are able to access the scores.

Due to the nature and size of golf courses, which may typically span 100 acres, comprehensive real-time scores—that is, up-to-the-minute scores of every competitor—can only be compiled using a relay system such as RTSS. During a golf tournament, different groups of players compete contemporaneously at different holes such that any one spectator can only view a limited number of players at any one of the eighteen holes at any given time. Thus, in order to generate real-time scores, it is necessary to have individuals stationed at each of the different holes as the tournament progresses so that the entire golf course can be monitored simultaneously. Acknowledging that some kind of relay system is needed to generate the type of real-time scoring information it wishes to syndicate, Plaintiff submits that it is unable to implement such a system itself due to PGA Tour rules prohibiting unauthorized use of wireless communication devices on the golf course at its tournaments.[1] *See* Baseman Aff. ¶ 12.

Plaintiff alleges that beginning in 1996, it began transmitting real-time golf scores on its web-sites, *jacksonville.com* and *augustachronicle.com*, from which it generates revenue through advertising and subscriptions. In addition, Plaintiff has contracted with a number of third parties to syndicate the real-time golf scores it collects. Defendant has also contracted to sell the scores it gathers to third parties, including *USA Today* and *Golfonline.com*, and is, according to Plaintiff, the only significant competitor in the market for the re-sale of real-time golf scores ("the syndication market").

At all relevant times, Defendant has allowed credentialed members of the media, including Plaintiff, to transmit real-time scores obtained at the on-site press center on their own web-sites. Under the original terms of Defendant's On–Line Service Regulations ("OLSR"), scoring information appearing on a non-PGA Tour web-site could be published on any web-site, but not sooner than thirty minutes after the actual occurrence of the shots. Defendant's stated purpose for this regulation was to allow it to have the first opportunity to post the real-time scores on its web-site and those of its syndicates. *See* Moorehouse Aff. ¶ 12.

Beginning in January, 2000, Defendant amended its OLSR so that scoring information could appear on an unaffiliated web-site *either* no sooner than 30 minutes after the actual occurrence of the shots *or* when the information became legally available as public information. Under the amended OLSR, however, under no circumstances could "*scoring information . . . be used by, sold, given, distributed or otherwise transferred to, any party other than the Credentialed Site in any manner whatsoever, without the prior written consent of the PGA Tour.*" A violation of these regulations may result in revocation of the offending party's media credentials.

In August, 2000, at Plaintiff's request, Defendant agreed to waive the restriction on selling real-time golf scores to third parties on condition that Plaintiff agree to collect the scores to be sold for syndication from *pgatour.com* rather than the on-site media center. According to its Complaint, Plaintiff attempted to gather real-time golf scoring information using this alternative method but ultimately abandoned it as unworkable due to unacceptable delays and inaccuracies of *pgatour.com*. *See* Complaint ¶ 45. In the meantime, Plaintiff contracted with a number of third parties, including *The Denver Post, The Dallas Morning News,* and *The Richmond Times–Dispatch,* to syndicate real-time scores for the Tampa Bay Classic, a PGA Tour event scheduled to occur from October 19, 2000 through October 22nd.[2]

---

1. Plaintiff also argues that it would be socially wasteful for it to duplicate Defendant's efforts in implementing such a system.

2. The Court heard argument on the Motion for Preliminary Injunction one day before the Tampa Bay Classic was scheduled to begin and was thus unable to rule on the Motion in time for the tournament. The Motion is still

In a letter dated September 13, 2000, Carl Cannon, Vice President of Morris Communications Corporation and Publisher of the Florida Times Union, informed Defendant that Plaintiff's attempts at obtaining real-time scores through *pgatour.com* had failed, and requested that it be credentialed to syndicate real-time scores from the on-site media center. Timothy Finchem, Commissioner of the PGA Tour, replied to Cannon in a letter dated September 20, 2000, that Defendant would not accommodate Plaintiff's request. Subsequently, in a letter dated October 4, 2000, Finchem informed Cannon that a credential would be provided for the Tampa Bay Classic only on condition that scoring information collected on site be used only in publications within the Morris Communications Group, in accordance with the OLSR.

On October 11, 2000, Plaintiff filed its Complaint and Motion for Preliminary Injunction, alleging violations of section 2 of the Sherman Act, 15 U.S.C. § 2, the Florida Antitrust Act, Fla.Stat. § 542.19, and the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.201 *et seq.* Specifically, Plaintiff claims that Defendant possesses monopoly power over access to its golf tournaments and has unfairly used that power by attempting to stifle competition in the separate market for syndicated real-time golf scores. In response, Defendant argues that it enjoys a property right in RTSS, and that its regulations restricting the syndication of real-time golf scoring information gathered and generated by RTSS constitute a reasonable safeguard against would-be free riders seeking to unfairly capitalize on Defendant's product.

## II. Preliminary Injunction Standard

■ A preliminary injunction is an "extraordinary and drastic remedy" and should not be granted unless the movant clearly carries its burden of persuasion with respect to each of the following prerequisites: (1) a substantial likelihood of success by the movant on the merits; (2) that the movant will suffer irreparable harm unless the injunction issues; (3) that the threatened injury to the movant outweighs any threatened harm the injunction may cause the opposing party; and (4) that the injunction, if issued, will not disserve the public interest. *See, e.g., United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983); *Canal Authority v. Callaway,* 489 F.2d 567, 572–73 (5th Cir. 1974).

## III. Analysis

Having heard argument by both parties and upon review of the entire record in this matter, the Court finds that at this juncture in these proceedings, Plaintiff has not clearly carried its burden of persuasion, specifically in showing a substantial likelihood that it will ultimately prevail on the merits.

### A. *Substantial Likelihood of Success on the Merits*

■ In order to prevail on a claim of illegal monopolization under Section 2 of the Sherman Act,[3] a Plaintiff must show that the defendant possessed market power, and that it deliberately used that power in such a way as to injure not only competitors, but *competition* itself. *See Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 488, 112 S.Ct. 2072, 119

pertinent, however, in that Defendant sponsors tournaments on a near weekly basis such that the issues raised in the Motion still necessitate an expeditious ruling.

3. The Court's analysis of the Sherman Act also applies to the Florida Antitrust Act, which mirrors Section 2 of the Sherman Act and provides that "[i]n construing this chapter, due consideration and great weight [shall] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes." Fla.Stat. § 542.19.

In applying this provision, Florida courts have held that the Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act. *See St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.,* 457 So.2d 1028, 1032 (Fla.Dist.Ct.App. 1984).

L.Ed.2d 265 (1992) ("Our § 2 monopolization doctrines are ... directed to discrete situations in which a defendant's possession of substantial market power, *combined with* [its] exclusionary or anticompetitive behavior, threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power.") (emphasis added). Accordingly, it is not unlawful for a Defendant—even one who possesses monopoly power—to refuse to deal with its competitors if there are legitimate pro-competitive reasons for that refusal. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602–05, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

In this case, Plaintiff premises its monopolization claims on three different theories of antitrust law: the "essential facilities" doctrine, refusal to deal, and monopoly leveraging. Although each of these is a distinct theory of antitrust law, they all adhere to the central tenet articulated above that even a monopolist should not be punished for conduct that is not anticompetitive.

### 1) Essential Facilities

■ The essential facilities doctrine is based on the notion that "a monopolist in control of a facility essential to other competitors must provide reasonable access to that facility *if it is reasonable to do so.*" Abbott B. Lipsky, Jr. & J. Gregory Sidak, *Essential Facilities*, 51 Stan.L.Rev. 1187, 1190–91 (1999) (emphasis added). To prevail on an essential facilities claim, a plaintiff must show: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasability of providing the facility. *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708 F.2d 1081, 1132–33 (7th Cir.1983). Regarding the fourth element, the term "feasability" is not limited to technical feasibility, but also extends to economic justifications for denying a competitor access to the facility. *See id.* at 1133. Thus, a defendant may

overcome an essential facilities claim by showing a legitimate business reason for denying its competitors access. *See City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1381 (9th Cir.1992).

■ In this case, Plaintiff alleges that access to the on-site media center is essential to its ability to compete in the syndication market, that Defendant has denied it access (insofar as access is premised on Plaintiff's agreement not to syndicate real-time scores obtained in the media center), and that current PGA Tour rules foreclose alternative methods for generating real-time scores. Even assuming Plaintiff could prove all of these allegations, however, it would still need to show that it would be economically feasible for Defendant to allow it to syndicate real-time scores gathered from the on-site media center. Based on the evidence before it at this time, the Court finds that Plaintiff cannot demonstrate a substantial likelihood of success regarding this fourth element. In other words, even if Defendant possesses monopoly power, Plaintiff must still show that Defendant lacks a legitimate business justification for refusing to grant it a media credential under its desired terms. Moreover, at this stage in these proceedings, any doubts regarding the legitimacy of Defendant's proffered justification should be weighed in Defendant's favor. *See* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948 (2d ed. 1995) ("A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (citing *Cafe 207, Inc. v. St. Johns County*, 989 F.2d 1136 (11th Cir. 1993))).

In defense of its refusal to permit Plaintiff to syndicate real-time scores obtained from the on-site media center via RTSS, Defendant argues that it has a right to condition access to its private events on abidance by rules that it claims are designed to protect its property rights. Specifically, it asserts that if Plaintiff is

permitted to syndicate real-time scores obtained from the media center, it will be "free riding" on Defendant's costs in designing and operating RTSS.[4] Plaintiff counters that Defendant cannot have a legitimate property interest in real-time scores because the scores are factual information existing exclusively within the public domain. In support of this position, it relies on the Second Circuit's opinion in *National Basketball Association v. Motorola, Inc.*, 105 F.3d 841 (2d Cir.1997).

In *Motorola*, a central issue on appeal was whether the National Basketball Association ("NBA") could enjoin the defendants from transmitting real-time basketball scores over their paging devices under a "hot news" misappropriation theory.[5] *Id*. The "hot news" theory of intellectual property rights was first articulated in the seminal case of *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) ("INS"), in which the Supreme Court recognized a news publisher's property right in time-sensitive information for which the publisher had expended resources to gather. The *INS* Court reasoned that if services like the Associated Press were not assured of property rights in the news they paid to collect, they would cease to collect it and thus competition, and ultimately the public, would suffer.

Distinguishing the facts before it from *INS*, the Second Circuit held that unlike news gathered by the Associated Press, basketball scores were not subject to "hot

news" protection. In *Motorola*, the defendants' operation had relied on a "data feed" supplied by reporters who would monitor NBA games on television or radio from an off-site location. *Id*. at 844. The reporters would then key information into a personal computer which was ultimately relayed to individual pager systems. *Id*. Noting that the defendants had expended their own resources to collect and transmit the scores generated during NBA games, the court concluded that the NBA did not enjoy a protected property interest in basketball scores because unlike in *INS*, there was no danger of free riding. *Id*. at 854.

Despite Plaintiff's efforts to analogize its case to *Motorola*, there are some critical distinctions. Unlike the defendants in *Motorola*, Plaintiff cannot gather the real-time scores it needs without using Defendant's RTSS. Although the parties dispute the costs Defendant has incurred in producing and operating RTSS, the fact remains that if the Court were to grant the injunction Plaintiff seeks at this time, it would be implicitly authorizing some degree of free riding without the benefit of what evidence may be produced at trial.

A limited threat of free riding does not necessarily give rise to a "hot news" property right because, as the *Motorola* court noted, free riding only becomes detrimental to competition when "the ability of other parties to free-ride on the efforts of the [defendant] would so reduce the incentive to produce the product or service that its

---

4. Plaintiff has pointed out that the individuals responsible for gathering and transmitting scores from the golf course are unpaid volunteers and thus disputes that Defendant incurs substantial costs in operating RTSS. Defendant has cited other operational expenses, however, such as staffing and maintenance of its production truck, training volunteers, and the cost and operation of the hand-held transmitting devices, to refute Plaintiff's suggestion that Defendant's costs in operating RTSS are negligible. Although at present there is insufficient evidence before the Court to determine the exact amount of Defendant's operational costs, it would appear to be greater than the amount for which Plaintiff is willing to give credit. *See* Baseman Aff. FN 5.

5. The NBA had also argued in support of its motion for an injunction that the scores were protected under federal copyright laws. The court rejected this argument, holding that although broadcasts are protected under copyright law, the basketball scores themselves were not because they represented "purely factual information which any patron of an NBA game could acquire from the arena." *Motorola*, 105 F.3d at 847. By merely watching the game, the factual data could be obtained without resorting to any gathering technique used by the NBA or listening to broadcasters' description of the play-by-play color of the game. *Id*.

existence or quality would be substantially threatened." *Id.* at 852. Without a more complete factual record before it, however, the Court cannot presently determine the extent to which Defendant's incentive to produce and operate RTSS would be undermined if Plaintiff were allowed to free-ride on its investment. Similarly, while the reasonableness of Defendant's rules prohibiting unauthorized use of wireless communications devices on the golf course might affect a determination regarding the asserted anticompetitiveness of Defendant's conduct, that too will require a more complete record than is currently before the Court.

While Plaintiff attempts to liken real-time golf scores to real-time basketball scores, asserting that both exist solely in the public domain, this analogy is flawed. The defendants in *Motorola* were able to gather their information simply by tuning in to a publicly-aired television or radio broadcast. Thus, as the *Motorola* court specifically noted, any member of the public who wished to re-transmit the scoring information gathered from the broadcast would have been able to do so. *Id.* at 847. In contrast, Plaintiff here can only obtain the real-time scores it wishes to syndicate by accessing information gathered throughout the golf course simultaneously and then compiled and generated in a private media center. Unlike basketball, where there is only one score to follow and it is continuously broadcast during the course of a game, broadcasts of golf tournaments do not air the scores of all participating golfers[6] and at PGA Tour events this information can *only* be obtained through RTSS. In the case of golf tournaments sponsored by Defendant, real-time golf scores represent the end-product of a system which Defendant has deliberately designed for their production. Thus, it appears in this case that Plaintiff wants to capitalize not just on the golf scores themselves, but also on Defendant's mechanism

for simultaneously gathering and generating the scoring information. As the Supreme Court observed over 80 years ago, "we are dealing here not with restrictions upon publication but with the very facilities and processes of publication." *INS*, 248 U.S. at 237, 39 S.Ct. 68. It was this *process* of publication to which the Court concluded that "he who has fairly paid the price should have the beneficial use of the property." *Id.* at 240, 39 S.Ct. 68. At this stage in these proceedings, Plaintiff cannot point to a sufficient reason why Defendant's uniformly applied rules represent anything other than a legitimate business decision intended to allow it to reap the benefits of its investment.

### 2) Refusal to Deal

As Plaintiff notes in its memorandum, the essential facilities doctrine is a variety of a refusal to deal claim, and for the same reasons that Plaintiff cannot demonstrate a substantial likelihood of success on the merits of its essential facilities claim, it has not met that burden with respect to its refusal to deal claim.

■ Under certain circumstances, a unilateral refusal to deal may constitute an antitrust violation. *See Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1522 (11th Cir.1990). However, in order to prevail on a claim for refusal to deal, the plaintiff must show both the existence of monopoly power *and* anticompetitive intent. *See id.* ("It is clear that monopolistic or other anticompetitive intent is the key factor in determining whether a violation of § 2 has occurred."); *see also Mid–Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 615 F.2d 1372, 1388 (5th Cir.1980); *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5th Cir.1970). As noted above, in this case it appears that

---

**6.** While in a given golf tournament there may be some 200 players competing, television broadcasts typically track only the "leader-board," which displays the top scores among the entire field. Therefore, someone outside the golf course would be precluded from contemporaneously obtaining scores of players not listed on the leader-board.

Defendant's refusal to deal with Plaintiff (and any other member of the media who is unwilling to abide by the OLSR) is motivated by a legitimate desire to protect its property interest rather than a predatory or anticompetitive animus. Accordingly, Plaintiff has not shown a substantial likelihood that it will prevail on these grounds.[7]

### 3) Monopoly Leveraging

■ Plaintiff also alleges that Defendant has engaged in "monopoly leveraging" by using its monopoly power in PGA Tour events in an attempt to acquire monopoly power in the syndication market. "Monopoly leveraging" occurs when "a vertically integrated monopolist—i.e., a monopolist that operates on several levels of the market—uses its monopoly power on one level of the market to gain a competitive advantage on another level of the market." *Consolidated Gas Company of Florida, Inc. v. City Gas Company of Florida*, 912 F.2d 1262, 1284–85 (11th Cir. 1990) (Tjoflat, C.J., dissenting). Significantly, neither the Eleventh Circuit nor the Supreme Court has yet accepted the monopoly leveraging theory. *See Aquatherm Industries Inc. v. Florida Power and Light Co.*, 971 F.Supp. 1419, 1432 (M.D.Fla.1997), *aff'd*, 145 F.3d 1258 (11th Cir.1998). Thus, it would appear incongruous for this Court to find that Plaintiff has shown a substantial likelihood of success with respect to a claim that might not even state a recognized cause of action in this Circuit. Moreover, monopoly leveraging, like other claims brought under the antitrust laws, requires a showing of anticompetitive conduct. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272–75 (2d Cir.1979). As has already been noted, Plaintiff cannot clearly demonstrate at this point that Defendant's conduct is anticompetitive because of the reasonable likelihood that Defendant's restrictions on

syndication of real-time golf scores represent a procompetitive means of safeguarding a property interest.

It bears repeating that the Court does not by its opinion foreclose the possibility that Plaintiff might ultimately succeed in establishing an antitrust violation. There is a difference, however, between success at trial and a success in meeting the standard for a preliminary injunction. All the Court decides today is that Plaintiff has not achieved the latter.

### B. *Irreparable Harm*

■ Even if Plaintiff were able to demonstrate a substantial likelihood of success on the merits, the Court finds that Plaintiff has not met its burden with respect to showing irreparable harm. To demonstrate irreparable harm, a plaintiff must show that it has no adequate remedy at law, meaning that its injury "cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir.1987) (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir.1983)). Regarding its contracts to syndicate real-time golf scores which Plaintiff alleges will be undermined if Defendant is allowed to enforce its OLSR, the Court finds that any consequent injury would be sufficiently calculable so that if Plaintiff were to prevail on the underlying claims it could be properly redressed with money damages.

Beyond the value of the syndication contracts, Plaintiff additionally contends that it stands to suffer irreparable harm to its reputation if an injunction does not issue. Any damages to Plaintiff's reputation, however, can at best be only minimally attributable to Defendant. Under the OLSR, Plaintiff remains at liberty to gather real-time scores gathered on-site for publication on its own web-sites. Consequently, any potential injury to Plaintiff's

---

7. This same reasoning casts a shadow over Plaintiff's claim of attempted monopolization, the elements of which are that "(1) the defendant *has engaged in predatory or anticompetitive conduct* with (2) a specific intent to mo-

nopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (emphasis added).

reputation would be restricted to its reputation as a seller in the syndication market. As to this point, it would appear that any injury Plaintiff sustains would be at least partially self-inflicted. Aside from the brief period during which Defendant agreed to allow Plaintiff to syndicate real-time scores taken from *pgatour.com*, Plaintiff could not have reasonably expected to be able to syndicate real-time scores gathered on-site because such conduct was expressly prohibited by Defendant's OLSR. Accordingly, the Court finds that Plaintiff has failed to demonstrate that it will suffer the kind of irreparable harm needed to support a preliminary injunction.

### C. *Balance of Harms*

As discussed above, the facts of this case may ultimately compel a finding that Defendant has a protected property interest in RTSS which would be unfairly infringed if Plaintiff were granted unrestricted use of the real-time scores. Although Plaintiff may likewise suffer harm in terms of its ability to compete in the syndication market and from the loss of its existing syndication contracts, the Court is unable to conclude at this point that the potential injury to Plaintiff clearly outweighs the threatened harm to Defendant.

### D. *Public Interest*

Plaintiff asserts that the public is served by increased access to news and information. While this is surely true, there is also a strong public interest in ensuring fair and effective competition in the marketplace. As discussed above, the public interest is disserved when one competitor is permitted to free ride on the efforts of another, thereby threatening to "destroy the incentive to collect news in the first place." *Motorola,* 105 F.3d at 853. In this case, questions of public interest are inseparably intertwined with the underlying legal issues to the point where the Court cannot render a conclusive determination with respect to the one without first resolving the other. As has already been noted, Plaintiff has not shown a substantial

likelihood of success on its underlying claims. Therefore, Plaintiff cannot presently succeed in showing that the relief it seeks would not be adverse to the public interest.

### IV. Conclusion

For the reasons set forth herein, the Court finds that Plaintiff has not satisfied its burden so as to merit the emergency relief it requests. Accordingly, Plaintiff's Motion for Preliminary Injunction (Doc. No. 2, filed October 11, 2000) is **DENIED.**