750 So.2d 70 (1999)
Charles R. ABELE, Jr., Holly Jackson Abele, John Ralph and Fran Ralph, Appellants,
v.
Delores SAWYER, David Sawyer, Quality Concrete & Rental, Inc., Marvin Danto, James Danto, and Broward International Commerce Park, L.P., Appellees.
Nos. 98-1563, 98-2047 and 98-2420.
District Court of Appeal of Florida, Fourth District.
October 20, 1999.
Rehearing Denied December 14, 1999.
*72 Humberto H. Ocariz, Joseph A. DeMaria, and John M. Quaranta of Tew Cardenas Rebak Kellogg Lehman DeMaria & Tague, L.L.P., for appellants.
Linda A. Conahan and Ann M. Burke of English, McCaughan & O'Bryan, P.A., Fort Lauderdale, for Appellees Marvin Danto, James Danto and Broward International Commerce Park, L.P.
Mimi L. Sall and Bradford Swing of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Fort Lauderdale, cocounsel, for Appellee Broward International Commerce Park, L.P.
Joseph S. Geller and Peggy Fisher of Geller, Geller & Garfinkel, Hollywood, for Appellees Delores Sawyer, David Sawyer and Quality Concrete & Rental, Inc.
WARNER, C.J.
This is an appeal from a final order dismissing appellants' ("the Abele Group") complaint for constructive trust and tortious interference against the appellees, Dantos, and for injunctive relief against all of the appellees. The underlying transaction for which relief was sought involved a failed land and construction transaction. We affirm the trial court's dismissal of the constructive trust count against the Dantos because they did not hold the property on which the constructive trust was sought. However, we reverse the dismissal of the count for tortious interference, as the complaint sufficiently alleged all elements of that cause of action. In regards to the injunction, we affirm.

I. Allegations of the Complaint.
The detailed allegations of the complaint and its attachments explain the factual background surrounding this case. Charles Abele originally entered into a contract with Village Development to purchase approximately 25 acres of vacant land for the purpose of constructing and developing a commercial center which he intended to sell. The acreage was divided into several parcels which Abele could purchase individually at certain set intervals. For this purpose, he formed a corporation called Broward International Commerce Center ("BICC"). Needing additional financing, he brought the Sawyers and the Ralphs into the transaction. Several agreements were entered into by the various parties. Holly Abele and Delores Sawyer executed an irrevocable voting trust. Charles Abele and Delores Sawyer signed an organizational statement as BICC directors and all of the parties entered into a Shareholder's Agreement. As a result of all of these documents, Delores Sawyer became BICC's president, secretary, treasurer, and director. Charles Abele was the named vice-president and director of the company. Delores also owned 50% of the shares of the company, with the Abeles owning 40% and the Ralphs 10%. However, through a series of other agreements, Delores was given voting control of 55% of the shares, giving the Sawyers voting control of the company. Voting control was given in return for the Sawyers' personal guarantee of the loans procured on behalf of BICC. The Abeles and the Ralphs constitute the Abele Group.
Pursuant to the Shareholders Agreement, Charles Abele placed $100,000 in BICC's account for working capital and assigned his rights under the original land purchase contract to BICC. The Sawyers agreed to provide equity above the $100,000 and handle the day-to-day operations of the development of the land. The agreement also required an affirmative vote of seventy-five percent of the outstanding shares to terminate or liquidate the development project.
The Shareholders Agreement further provided that Quality Concrete, owned by the Sawyers, would be the general contractor for the project and would be paid the cost of construction plus a 10% profit. *73 BICC then purchased the first two parcels and entered into contracts to construct two commercial buildings on the land. During construction, Quality failed to pay the utilities contractor, who was transferred shares of the corporation in satisfaction of payment. Nevertheless, due to the voting trusts, Delores Sawyer continued to retain voting control of 51% of the shares of stock.
Charles Abele actively marketed the property and eventually found prospective buyers, the Dantos. The Dantos offered to provide $1,250,000 in additional capital to assist in the completion of the project, to be credited against a purchase price of $21 million. After BICC approved the Dantos as purchasers, Charles Abele and David Sawyer, as developers, signed a purchase contract with the Dantos, but the contract provided that the Dantos were contracting "not individually but on behalf of an entity to be formed and without personal liability." The purchase agreement permitted the Dantos to assume development of the property and acquire the remaining land from Village Development if BICC were in default of its obligations. The Dantos subsequently assigned their rights under the purchase agreement to Commerce Park, a limited partnership whose general partner was Danto Investment Company, which was wholly owned by the Dantos. The complaint alleges that Village Development has not declared BICC in default of any of its obligations, as of the date of the amended complaint.
The project continued to experience difficulties, and the Sawyers wanted to allow the Dantos to purchase the remaining parcels immediately. However, the Abele Group disagreed. After a shareholders meeting on May 10, 1997, the parties agreed not to take any action for the next thirty days without the other party's approval. They also agreed to extend the closing date for the sale of the next parcel by one month. Contrary to that agreement, the complaint alleges that the Sawyers and the Dantos had already conducted secret meetings. The day before the May meeting, Delores Sawyer held another shareholders meeting, of which the Abele Group had no notice. During that meeting, Delores Sawyer agreed that the deadline for closing the sale of the fourth parcel could not be extended beyond the May 15th closing date without written approval of the Dantos.
A month later Charles Abele delivered a letter to Delores Sawyer objecting to her agreement not to extend the closing date on the purchase of the parcel without the approval of the Dantos. He also sent a letter to the Dantos objecting to their interference in the relationship between the Abele group and the Sawyers. He advised the Dantos that the Sawyers did not have any authority to convey property or assets of BICC without the express written consent of the shareholders.
Abele sent a second letter on June 17, 1997, to counsel for the Sawyers claiming that Delores Sawyer was breaching her fiduciary duties to BICC. In the letter, the Abele Group specifically stated that it believed that any sale or transfer of BICC property would violate the 75% approval provision of the Shareholders Agreement. Unbeknownst to Abele, Delores Sawyer conducted another shareholders meeting on that very day without notice and removed him as an officer and director of BICC, replacing him with her husband. One day later, Delores Sawyer executed a Special Warranty Deed transferring all of the real estate owned by BICC to defendant Commerce Park.

II. Constructive Trust.
In the count for constructive trust, the Abele Group sued all of the defendants alleging that the contract for purchase between the Dantos and BICC and its shareholders created a confidential and fiduciary relationship which was breached by "the transfer to the Dantos and/or Commerce Park of most, if not all, of the real and personal property of BICC" prior to construction of all the buildings. As to the other defendants, the constructive trust *74 count made other allegations, which need not be detailed here.
A constructive trust is imposed by operation of law as an equitable remedy in a situation where there is a wrongful taking of the property of another. See Finkelstein v. Southeast Bank, N.A., 490 So.2d 976, 984 (Fla. 4th DCA 1986). The necessary elements for imposition of a constructive trust are: (1) a promise, express or implied; (2) a transfer of the property and reliance thereon; (3) a confidential relationship; and (4) unjust enrichment. See Provence v. Palm Beach Taverns, Inc., 676 So.2d 1022, 1024 (Fla. 4th DCA 1996).
While the facts are complicated, the resolution of the constructive trust issue on appeal is fairly simple. The court properly dismissed the claim for constructive trust against the Dantos, because the Dantos were never the legal or equitable title holders of the property which would be the subject of the constructive trust. The Dantos did not sign the purchase agreement in their individual capacities, but rather they expressly stated that they were signing for an entity yet to be formed. When the property was actually transferred, Commerce Park took title. Thus, the Dantos are not, nor were they ever, in possession of the property to which the Abele Group seeks to attach a constructive trust. A court will not impose a constructive trust over a defendant's general assets. See Finkelstein, 490 So.2d at 983. If the Abele Group were to prevail on the factual issues of its complaint, that would be the only relief available against the Dantos, because the property at issue is not, and never was, in the Dantos' individual possession. See Trend Setter Villas of Deer Creek v. Villas on the Green, Inc., 569 So.2d 766, 768 (Fla. 4th DCA 1990).
The Abele Group argues that the allegation in the complaint that the property was transferred to the Dantos must be taken as true for purposes of a motion to dismiss. First, the complaint alleges that the property was transferred to Commerce Park and not to the Dantos in the general allegations of the complaint and further alleges that it was transferred to the Dantos "and/or Commerce Park" in the count for constructive trust. Second, the attachments to the complaint, including the purchase agreement and warranty deed, show that the property was deeded to Commerce Park. While the court must confine its review to the four corners of the complaint and must accept as true all well-pleaded allegations, see Aaron v. Allstate Ins. Co., 559 So.2d 275, 276 (Fla. 4th DCA 1990), the exhibits are encompassed within the four corners of the complaint and must be considered therewith. See Fla. R. Civ. P. 1.130(b). Our affirmance of the dismissal of this count is without prejudice to refiling the same if property belonging to BICC is discovered in the possession of the Dantos, individually.
The Abele Group alternatively argues that a constructive trust claim may be used to account for improperly received money. See Williams v. Hunt Bros. Constr., Inc., 475 So.2d 738, 741 (Fla. 2d DCA 1985). However, there are no allegations in the complaint that the Dantos received any monies from BICC or anyone connected therewith. Consequently, this argument is meritless.

III. Tortious Interference.
A cause of action for tortious interference with an advantageous business relationship requires the following four elements: (1) the existence of a business relationship under which the plaintiff has legal rights, (2) knowledge of the relationship by the defendant, (3) an intentional and unjustified interference with the relationship by the defendant, and (4) damages to the plaintiff as a result of the breach of the relationship. See Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla.1994); North Am. Van Lines, Inc. v. Ferguson Transp., Inc., 639 So.2d 32, 33 (Fla. 4th DCA 1994), approved, 687 So.2d 821 (Fla.1996). The Abele Group contends that it alleged sufficient ultimate facts as to each element to *75 withstand the Dantos' motion to dismiss. We agree.
Despite the Dantos' argument that the contracts which are at issue were entered into between BICC, the Dantos, and Quality Concrete, the complaint focuses on the Shareholders Agreement as providing a business relationship between the Abele Group and the Sawyers. That agreement required Delores Sawyer to manage the company and vote the Abele Group's stock "in good faith." It obligated the Sawyers to provide equity for the project above that supplied by Abele. But it also provided that a decision to terminate or liquidate the project required an affirmative vote of 75% of the outstanding shares. As the complaint states, "while the Sawyers were permitted to manage BICC, a decision to terminate or liquidate the project and sell its assets required the approval of 75% of the outstanding shares of the Company." In other words, such a decision could be made only jointly by the Abele Group and the Sawyers. It is that business relationship which is the center of the tortious interference claim. According to the complaint, Charles Abele notified the Dantos of the Group's objection to their interference with BICC's operation and advised them that the Sawyers had no authority to convey the assets or property of BICC without the express consent of the shareholders. Thus, the first two elements of the cause of action were sufficiently alleged.
The Abele Group also sufficiently alleged an intentional and unjustified interference with the relationship by relating the secret meetings between the Sawyers and the Dantos to sell all of the property and assets of the development without the concurrence of the Abele Group. While the Dantos claim that Commerce Park was simply exercising its legal rights under its contract to purchase the BICC development, on the face of the complaint the allegations are still sufficient to state a cause of action. Commerce Park's right to purchase prior to full development was conditioned on BICC's default with Village Development. Because there had been no default, according to the allegations of the complaint, it does not show on its face or in the attached exhibits that Commerce Park was "justified" in purchasing the assets and property prior to full development. The complaint alleges that the Dantos interfered with the relationship between the Abele Group and the Sawyers, causing them to violate the Shareholders Agreement by agreeing to sell all of the property and assets of BICC to Commerce Park before the property was fully developed and without the approval of the requisite number of shareholders.
Justification or privilege to interfere with a contract is a defense to a tortious interference action. See Wackenhut Corp. v. Maimone, 389 So.2d 656, 658 (Fla. 4th DCA 1980). The Dantos' claim is an affirmative defense, because they allege that they were privileged in interfering with the agreement on behalf of Commerce Park. Where an affirmative defense appears on the face of the complaint, it may be raised in a motion to dismiss. See Fla. R. Civ. P. 1.110(d). In this case, the complaint does not allege facts showing that Commerce Park was privileged to assert its contractual rights.
The complaint alleges that the Abele Group was damaged as a result of the actions of the Dantos. The Dantos argue that the Abele Group cannot bring this suit, because its members have no rights separate and distinct from those of the corporation or other shareholders. See Fort Pierce Corp. v. Ivey, 671 So.2d 206, 207 (Fla. 4th DCA 1996). Specifically, they claim that the allegations support only a derivative action on behalf of the corporation. From the allegations of the complaint it is not possible to determine whether or not the Dantos' assertion is true. The complaint alleges damages to the Abele Group. That is sufficient to state a cause of action. Whether the damages claimed are those common to all shareholders so that the action is truly a *76 derivative action must be shown through other pleadings and proceedings.
Finally, the Dantos contend that the action is barred by the economic loss rule. We have previously ruled that a claim of intentional interference with a contract is sufficiently independent to withstand the bar of the economic loss rule. See Centro Nautico Representacoes Nauticas, LDA. v. International Marine Co-op, Ltd., 719 So.2d 967, 970 (Fla. 4th DCA 1998); Bankers Risk Management Servs., Inc. v. Av-Med Managed Care, Inc., 697 So.2d 158, 161 (Fla. 2d DCA 1997).
The Abele Group having sufficiently alleged all elements of the cause of action for tortious interference, the trial court erred in dismissing this count of the complaint.

IV. Injunction.
The Abeles sought an injunction against all defendants preventing the disposition of any BICC assets. The trial court dismissed the count for injunction against the Dantos with prejudice and dismissed the count against the Sawyers without prejudice.[1]
We agree with the trial court that the complaint fails to show that irreparable damage will occur, an essential prerequisite to injunctive relief. See Hiles v. Auto Bahn Fed'n, Inc., 498 So.2d 997, 998 (Fla.4th DCA 1986). While the complaint alleges that the transfer of the BICC property will cause irreparable harm, it also attaches a dollar amount to that harm, negating the allegation that the harm cannot be compensated with money damages. Moreover, the only claim remaining against the Dantos is the claim for tortious interference, which will result in a damage award if proven. Similarly, several counts remain pending against the Sawyers, such as breach of the Shareholders Agreement, which also could lead to an award for damages. Therefore, we affirm the dismissal of the count for injunction against the Dantos and the Sawyers.
In conclusion, we affirm the dismissal of count I for constructive trust and count VII for injunctive relief against the Dantos. We also affirm the order granting dismissal of the count for injunctive relief against the Sawyers. We reverse the dismissal of count II for tortious interference against the Dantos.
Affirmed in part; reversed in part, and remanded for further proceedings.
STEVENSON, J., and CONNER, BURTON C., Associate Judge, concur.
NOTES
[1] We have jurisdiction to review the order dismissing a count of a complaint for injunctive relief under rule 9.130(a)(3)(B) of the Florida Rules of Appellate Procedure on the grounds that no irreparable injury is shown, as this is tantamount to an order denying an injunction on the same grounds.