SPECIAL PURPOSE ACCOUNTS RE-
CEIVABLE COOPERATIVE COR-
PORATION and Canadian Imperial
Bank of Commerce, as Agent, Plain-
tiffs,

v.

PRIME ONE CAPITAL COMPANY,
L.L.C., Signature Automotive Group,
Inc., and Thomas Borzilleri, individu-
ally, Defendants.

No. 00–6410–CIV.

United States District Court,
S.D. Florida.

Dec. 19, 2000.

C. Ryan Reetz, Greenberg Traurig, P.A., Miami, FL, Lori Le Par Roeser, Chicago, IL, for plaintiffs.

Bruce David Green, Ft. Lauderdale, FL, Joseph De Maria, Miami, FL, for defendants.

**ORDER DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

GOLD, District Judge.

THIS CAUSE is before the court upon the defendants' motion to dismiss the complaint or, in the alternative, for summary judgment (DE # 69). The plaintiffs, Special Purpose Accounts Receivable Cooperative Corporation ("SPARC") and Canadian Imperial Bank of Commerce, ("CIBC") filed a four-count complaint against the defendants, Prime One Capital Company ("Prime One"), Signature Automotive Group ("Signature"), and Thomas Borzilleri ("Borzilleri"), alleging as · follows: Count. I, conversion of lease proceeds; Count II, conversion of vehicles; Count III, tortious interference with business and contractual relations; and Count IV, permanent injunctive relief. The plaintiffs seek to hold the defendants liable for the alleged misappropriation of lease proceeds and vehicles that were pledged to the plaintiffs pursuant to a security agreement between the plaintiffs and a third party. Subject matter jurisdiction exists by virtue of diversity jurisdiction, and there is no dispute that Florida law applies. On December 15, 2000, the court heard arguments on the defendants' motion. After carefully considering the pleadings, evidence, and arguments of counsel, the court

denies the defendants' motion to dismiss or, in the alternative, for summary judgment.

### Statement of Facts

#### I. The Parties[1]

SPARC is a California corporation with its principal place of business in New York, and CIBC, SPARC's agent, is a Canadian corporation with its principal place of business in Toronto. As financial institutions, the plaintiffs are in the business of making secured advances to other corporations. Prime One is a Washington limited liability corporation with its principal place of business in Florida; Signature is a Florida corporation with its principal place of business in Florida; and Borzilleri is a resident of Florida and the sole member of Prime One and President of Signature. Signature is a fleet lessor of motor vehicles to daily rent-a-car agencies. Prime One was formed by Borzilleri and others who are not parties to this case for the purposes of originating motor vehicle leases and servicing those leases.

#### II. The Securitization Facility[2]

In June of 1998, the plaintiffs entered into a "Contracts Credit Agreement" with T & W Financial Services Company ("T & W"), which was engaged in the business of providing equipment financing, primarily in the form of leases, and T & W Funding Company VIII ("Funding Company"), a T & W subsidiary. *See* Pl.Am. Compl. at Ex. A; Christomos Decl. ¶ 2. This agreement gave rise to a complex Securitization Facility which essentially loaned funds to T & W through Funding Company. Pursuant to the Contracts Credit Agreement, SPARC advanced funds to Funding Company, which used those funds to purchase certain installment sales contracts and leases, including motor vehicle leases, and the underlying assets of T & W. *See id.* As security for its obligations to SPARC, Funding Company granted CIBC (as SPARC's agent) a security interest in the proceeds and underlying assets. T & W agreed to act as the initial servicer of the assets acquired by Funding Company. As servicer, T & W was responsible for collecting lease payments and vehicle liquidation proceeds and remitting those payments to CIBC pursuant to CIBC's security interests in the lease proceeds and vehicles. *See* McCarthy Affid. at ¶ 4. CIBC, in turn, served as SPARC's agent under the Contracts Credit Agreement. *See id.*

The defendants assert in their Local Rule 7.5 statement that the plaintiffs have failed to perfect their security interests in the motor vehicles that were pledged to them. *See* Def.'s Mtn. at p. 3. The plaintiffs, on the other hand, have submitted proof that they took possession of the leases in question, filed UCC–1 financing statements to perfect their liens on the pledged property, and delivered the chattel paper representing the leases to Northwest Bank Minnesota, as custodian for CIBC. *See* Stern Affid. at ¶¶ 10–11, Ex. E. They also claim that their new servicing agent has physical possession of all the certificates of title that are in the name of T & W. *See* Beck Affid. at ¶ 15.

#### III. The Defendants' Relationship with T & W and Funding Company

In July of 1998, T & W established Prime One with Joseph David Pacifico ("Pacifico") and Thomas Borzilleri. Prime

---

1. Pursuant to Southern District of Florida Local Rule 7.5, the defendants filed a concise statement of facts as to which they claim there is no dispute; however, the only allegations contained in that statement as to which there actually has been no dispute is the description of the parties to this lawsuit. The plaintiffs have contravened all other allegations in the defendants' statement.

2. From this section on, all of the facts contained in this order are derived from the evidence submitted by the parties in conjunction with the defendants' motion. The defendants either have failed to include these facts in their Local Rule 7.5 statement or the plaintiffs have effectively refuted the defendants' allegations.

One was formed for the purpose of originating motor vehicle fleet leases, which were to be assigned to T & W. *See* Christomos Affid. at ¶ 5; Price Affid. at ¶ 4. T & W, in turn, was to fund these leases by borrowing the necessary capital from its lenders, such as the plaintiffs. *See id.*

Under this arrangement, Prime One would assist in the purchase of vehicles from automobile manufacturers through Signature, and it would negotiate and execute fleet lease or installment sales contracts with lessees. *See* Christomos Affid. at ¶¶ 5–7. Most of these leases obligated the lessees to make monthly payments throughout the lease term and to surrender the vehicles to the lessor at the end of the term. After negotiating the leases and lease schedules with a prospective lessee, Prime One assigned the lease and the underlying equipment to T & W, which provided Prime One with the funds to pay for the vehicles. *See* Christomos Affid. at ¶¶ 7, 21, Ex. I; Stern Affid. at ¶ 13. T & W then sold and/or contributed these leases and vehicles to Funding Company, which, in turn, pledged them to CIBC to secure the repayment of the SPARC loan under the Contracts Credit Agreement. *See id.* at ¶ 16. At various times, Borzilleri, acting through Prime One and/or Signature, arranged for the liquidation of leased vehicles at the end of the lease term, collected vehicle liquidation proceeds, and collected residual payments. *See* McCarthy Affid. at ¶ 16. Prime One was to remit these proceeds to T & W so that T & W could account for the lease proceeds. *See* Pl.Am.Compl. at ¶ 28.

In the Summer of 1999, T & W informed Borzilleri that it was going to take over the servicing activities that Prime One previously had undertaken because Borzilleri's intervention in servicing was disrupting T & W's account management. *See* McCarthy Affid. at ¶ 18. T & W told Borzilleri that he was to remit auction proceeds directly to T & W and that T & W would be collecting all residual payments. *See id.*

## IV. T & W Defaults and Finova Steps In

On December 1, 1999, CIBC informed T & W that it had defaulted on its obligations under the Contracts Credit Agreement. On that same date, T & W withdrew from the Prime One joint venture, leaving Borzilleri as the sole remaining member of Prime One. (Pacifico had withdrawn in September of 1999.) *See* McCarthy Affid. at ¶ 19.

On December 20, 1999, the plaintiffs replaced T & W as the servicer of Funding Company's lease portfolio with Finova Loan Administration ("Finova"). *See* O'Keefe Affid. at ¶ 4. Such an arrangement was specifically provided for by the Contracts Credit Agreement. Finova assumed all of T & W's rights and obligations as servicer under the Contracts Credit Agreement, and T & W granted Finova an irrevocable power of attorney to take any necessary actions to enforce the lease obligations on behalf of Funding Company. *See id.* On December 22, 1999, T & W and Finova notified all lessees that Finova had replaced T & W as servicer for the leases. *See* Beck Affid. at ¶ 4.

Borzilleri also was informed that T & W had been terminated as servicer of the leases. *See* Beck Affid. at ¶ 4; McCarthy Affid. at ¶ 21. Despite this notification, Borzilleri attempted to persuade the plaintiffs to appoint Borzilleri and/or Prime One to act as the servicer for the leases, rather than Finova. *See* O'Keefe Affid. at ¶¶ 5, 8. The plaintiffs rejected this proposal and instructed Borzilleri to remit to them any lease proceeds that he or his companies may have possessed. *See* O'Keefe Affid. at ¶¶ 9–11.

The defendants claim that they were authorized to continue managing and servicing the leases in question by a power of attorney issued by T & W, *see* Def.'s Mtn. at Ex. A., but the plaintiffs have submitted the affidavit of the President of T & W, who states that T & W never authorized the issuance of these powers of attorney. *See* Price Affid. at ¶¶ 14–16. The Presi-

dent of T & W informed Borzilleri in writing that if someone at T & W had granted him powers of attorney, they were without force and effect. He also informed Borzilleri that, even if such a power had been invalid, it was effectively nullified when the plaintiffs terminated T & W's authority to service the leases in December of 1999. *See* Price Affid. at Ex. E.

## V. The Defendants' Alleged Unlawful Conduct

The plaintiffs claim that the defendants have engaged in unlawful conduct by misappropriating lease proceeds and vehicles that belonged to the plaintiffs. Specifically, they claim that Borzilleri and/or Prime One has continued to represent itself to lessees as the servicer of the leases. *See* Roeser Affid. at Ex. A, B. While Borzilleri has remitted approximately $1.7 million in lease proceeds to the plaintiffs, it has withheld additional funds from them. *See* Stern Affid. at ¶ 15. Borzilleri, acting through *Prime One and/or Signature*, has informed lessees that Prime One is entitled to the lease proceeds and has threatened certain lessees with legal action if they remit proceeds or tender leased vehicles to Finova. *See id.* Borzilleri also has informed lessees that they can satisfy their lease obligations by tendering amounts significantly below the agreed residual values to him, rather than Finova. *See* DeVos Depo. at pp. 27, 29–32, 88; Petersen Depo. at pp. 55, 59–62.

### *Standard of Review*

The defendants' motion is for a dismissal of the complaint under Federal Rule of Civil Procedure 12(b)(6) or for summary judgment under Rule 56. Because the parties, particularly the plaintiffs, have submitted evidence obtained through discovery in support of their arguments, the court has analyzed the defendants' motion as one for summary judgment. *See Henderson v. Carnival Corp.*, 2000 WL 1725355, No. 99–503–CIV (S.D.Fla. Sept. 29, 2000) (treating alternative motion as one for summary judgment where both parties submitted affidavits).

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. Sept. 1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.*, 121 F.3d at 646. Once the moving party has established the absence of a genuine issue of material fact, to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *See Anderson*, 477 U.S. at 247–51, 106 S.Ct. at 2510–11. In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513.

These principles are equally applicable when, as in this case, the plaintiff is seeking entry of summary judgment, and the defendant has asserted affirmative defenses. On a plaintiff's motion for summary judgment, the defendant bears the initial

burden of showing that the affirmative defense is applicable. *See Blue Cross and Blue Shield v. Weitz,* 913 F.2d 1544, 1552 (11th Cir.1990); *Office of Thrift Supervision v. Paul,* 985 F.Supp. 1465, 1470 (S.D.Fla.1997); *Chatham Steel Corp. v. Brown,* 858 F.Supp. 1130, 1154 (N.D.Fla. 1994). Only upon such a showing does the burden shift to the plaintiff regarding that affirmative defense. *See Weitz* at n. 13. The reason is that the defendant bears the burden of proof on his or her affirmative defense at trial. *See Thorsteinsson v. M/V Drangur,* 891 F.2d 1547, 1550–51 (11th Cir.1990). Summary judgment is therefore appropriate when the defendant fails to come forward with evidence sufficient to dispute an element of the plaintiff's case or to support an affirmative defense. *See Office of Thrift Supervision v. Paul,* 985 F.Supp. 1465, 1470 (S.D.Fla.1997).

***Analysis***

At the outset, the court notes that its task in evaluating the defendants' motion was made particularly difficult by the inadequacy of the defendants' Local Rule 7.5 statement. The defendants' concise statement of material facts as to which there are no genuine issues to be tried refers only to the nature of the parties, the powers of attorney allegedly issued by T & W, and the plaintiffs' supposed failure to perfect their security interest. The defendants do not address, for example, the Contracts Credit Agreement, the default of T & W, and the substitution of T & W by Finova. All of these facts are material to the plaintiffs' claims. By not including them in their Local Rule 7.5 statement, the defendants implicitly are admitting that these facts are in dispute and remain for trial. During oral argument, defendants' counsel raised several good points in an attempt to remedy this deficiency, but these arguments were not contained in the defendants' briefs and were unsupported by the record.[3] Additionally, as will be addressed in more detail below, the plaintiffs have submitted sufficient evidence to refute the allegations that are contained in the defendants' briefs regarding their alleged powers of attorney and the perfection of the security interest.

Despite these deficiencies that would allow the court to summarily deny the defendants' motion, in the interests of deciding the case on the merits, the court has conducted an exhaustive, independent review of the record and the parties' legal arguments. The defendants contend that they are entitled to dismissal of all four counts of the plaintiffs' complaint. They also claim that there is no basis to justify holding Borzilleri individually liable. The court's order addresses each of these arguments.

**I. Conversion of Lease Proceeds**

[redacted] Count I of the plaintiffs' amended complaint seeks to hold the defendants liable for conversion of the lease proceeds. Conversion is defined as, "[A]n act of dominion wrongfully asserted over another's property inconsistent with his ownership therein. In essence, conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time. It is the disseisin of the owner or an interference with legal rights which are incident to ownership, such as a right to possession." *Burger King Corp. v. Austin,* 805 F.Supp. 1007, 1012 (S.D.Fla.1992) (citations omitted); *see also Kee v. National Reserve Life Ins. Co.,* 918 F.2d 1538, 1541 (11th Cir.1990) (defining tort and finding that plaintiff had failed to state claim for conversion). Florida courts have divided this description into three elements: (1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.

3. For example, during oral argument, defendants' counsel contended that the powers of attorney were irrevocable because they were coupled with an interest. If the defendants had fully developed this argument in their written motions and submitted undisputed evidence on this point, this argument may have entitled them to summary judgment on some of the plaintiffs' claims.

*See Warshall v. Price,* 629 So.2d 903, 904 (Fla. 4th DCA 1993) (analyzing each element to find that plaintiff had established conversion claim). According to the plaintiffs, the defendants have engaged in conversion by knowingly and wrongfully refusing to returns the lease proceeds that are the subject of the plaintiffs' security interest.

■ The defendants make two arguments in support of their motion. First, they claim that the plaintiffs cannot prevail on Count I because they seek relief for the conversion of money in general, not a specific identifiable fund. To establish a claim for the conversion of money, there must exist a specific fund capable of separate identification. Florida courts have stated, "To be a proper subject of conversion each coin or bill need not be earmarked, but there must be an obligation to keep intact or deliver the specific money in question, so that such money can be identified." *Bankest Imports, Inc. v. ISCA Corp.,* 717 F.Supp. 1537, 1542 (S.D.Fla.1989) (quoting *Belford Trucking v. Zagar,* 243 So.2d 646 (Fla. 4th DCA 1970)). Money is capable of identification where it is delivered "at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit. . . ." *Id.*

■ The plaintiffs have alleged and shown that the lease proceeds are an identifiable sum capable of being converted. When T & W defaulted on its obligations under the Contracts Credit Agreement, the plaintiffs acquired a right of possession to the lease proceeds and vehicles. *See* Pl.Am.Compl. at Ex. B, §§ 6.01–6.09. Exhibit C to the plaintiffs' amended complaint lists the vehicles that were subject to the plaintiffs' security interest. By identifying each vehicle by number and model, the plaintiffs have shown that a mechanism exists to identify and trace the funds that allegedly were converted by the defendants. For example, if the plaintiff can show at trial that the vehicle identified by Finova account number 810054B and T

& W lease number 11517701 was subject to a lease of $300.00 per month, and these funds were recovered and retained by the defendants for six months, absent any valid defenses by the defendants, the plaintiffs will have shown that the defendants converted $1,800, a sum that represents the funds that were to be generated by that vehicle. *See* Pl.Am.Compl. at Ex. C (listing vehicles by identification numbers).

The Eleventh Circuit reached a similar result in *Bel–Bel International Corp. v. Community Bank of Homestead,* 162 F.3d 1101 (11th Cir.1998), where it upheld creditors' conversion claims against other lenders. The debtors in *Bel–Bel* pledged as collateral for a note from the creditors the accounts receivable of certain tomato crops, much like T & W has pledged its lease proceeds to the plaintiffs as collateral. *See id.* at 1104. When the debtor defaulted on his loans, subsequent lenders exercised control over these receivables and thereby prevented the original creditors from exercising their right of possession. The court found that the lenders' exercise of control was wrongful because the crop proceeds previously had been pledged to the creditors, who lost the money that otherwise would have provided the repayment for their loans. *See id.* More importantly, the court found that, even though the accounts receivable for the tomato crops were dispersed among several parties, there was a specific, identifiable fund because the money that had been misappropriated could be traced to any proceeds that arose from the sale of the crops in question. *See id.* Similarly, in this case, the plaintiffs have provided a mechanism for tracing the funds received from the leases.

The defendants' argument regarding the specific fund requirement also fails because the policy underlying the rule makes it inapplicable to Count I of the complaint. The specific fund requirement is an exception to the general principle that a contractual obligation to pay money cannot be enforced through a conversion action. *See*

*Bel–Bel,* 162 F.3d at 1109. The plaintiffs in this case do not seek to recover general contractual obligations to pay money, which courts uniformly hold are not subject to conversion claims. *See id.* ("[A]n action in tort is inappropriate where the claim is based on breach of contract.") (citations omitted). Here, no contractual relationship existed between the plaintiffs and the defendants. As a result, the plaintiffs' claim cannot be characterized as an attempt to transform a breach of contract action into a tort action, and thus, it is not the type of claim to which the specific fund requirement was intended to apply. *See id.*

■ The defendants' second argument on Count I is that the plaintiffs have no possessory interest in the lease proceeds and, therefore, cannot assert a claim for conversion of those funds. The defendant's argument fails because there is at least a genuine issue of material fact as to who owned the vehicles and was entitled to their proceeds.[4] According to the defendants, Prime One owned the vehicles in question, but the record is devoid of any documents or testimony from which the court can conclude that the defendants had an ownership or possessory interest in any of the motor vehicles. Instead, when the Contracts Credit Agreement is taken together with the plaintiffs' UCC–1 filing and T & W's default, an inference arises that the plaintiffs acquired a possessory interest in at least some of the vehicles in question. *See* Stern Affid. at ¶¶ 10–12, Ex. E; McCarthy Affid. at ¶¶ 4, 8, 12, Ex. A; O'Keefe Affid. at ¶ 2; Christomos Affid. at ¶ 16, Ex. E; Price Affid. at ¶ 7, Ex. A. The plaintiffs' possessory interest also is established by the fact that the purpose of the Prime One joint venture was to originate lease and sale contracts for T & W, not Prime One, Signature, or Borzilleri. *See* Price Affid. at ¶ 4. Additionally, there is

evidence that once Prime One obtained leases for T & W, it would immediately assign the leases to T & W, which would provide Prime One with the funds to purchase the necessary vehicles.[5] *See* Christomos Affid. at ¶ 7. These vehicles were purchased in T & W's name, not Prime One's, and the proceeds were to be paid to T & W or collected by Prime One and remitted to T & W. *See* McCarthy Affid. at ¶ 12; Price Affid. at ¶ 8–9. If, as defendants argue, they had a possessory interest in the lease proceeds, it makes no sense for T & W to have purchased the vehicles, acquired them in its name, received lease proceeds, or given the defendants a power of attorney to service the leases. Furthermore, if the defendants really owned the leases, CIBC would not physically possess the leases or the original titles, as it does. *See* O'Keefe Affid. at ¶ 2; Beck Affid. at ¶ 15. Because the defendants have not established any evidence in support of their argument that the plaintiffs lack a possessory interest in the lease proceeds or vehicles, their motion for summary judgment on Count I is denied.

## II. Conversion of Motor Vehicles

■ In support of their motion for summary judgment on Count II, the defendants contend that the plaintiffs cannot establish their conversion claim because no Florida Motor Vehicle Certificates have been issued in their names, and they have failed to perfect their security interest with the Florida Department of Highway Safety and Motor Vehicles. The plaintiffs counter that an action for conversion is regarded as a possessory action under Florida law, so questions of ownership are not crucial to the bringing of an action for conversion. *See Page v. Matthews,* 386 So.2d 815, 816 (Fla. 5th DCA 1980) (holding that buyer of trailer could assert con-

---

4. This is especially true because the defendants omitted this argument and supporting allegations from its Local Rule 7.5 statement.

5. Although the defendants claim that these assignments are invalid, they have introduced no evidence to support such a conclusion. Also, they omit such an allegation from their Local Rule 7.5 statement.

version action even though he did not have title in his name). All that a plaintiff must show is a right of possession, and, for the reasons discussed in the preceding subsection, the plaintiffs have created a genuine issue as to their possessory right. Even if this were not true, "a lienholder is considered to be an 'owner' for the purposes of conversion if he has a present right of possession." *See Bel–Bel Int'l Corp. v. Community Bank of Homestead,* 162 F.3d 1101, 1108 (11th Cir.1998). When T & W defaulted on its obligations, the plaintiffs acquired a possessory right to the vehicles and the lease proceeds and, therefore, became proper plaintiffs to a conversion action.

▮ The defendants attempt to distinguish this case from other conversion actions because it involves the right to possess motor vehicles, which are governed by a specific statute. Section 319.22 of the Florida Statutes governs the transfer of title to motor vehicles and provides that "a person acquiring a motor vehicle ... shall not acquire marketable title to the motor vehicle or mobile home until he has issued to him a certificate of title to the motor vehicle or motor home...." The defendants cite to cases, such as *Smith v. City of Miami Beach,* 440 So.2d 611 (Fla. 3d DCA 1983), which provide that a lien on a motor vehicle titled in Florida can be perfected only when such a lien is noted on the certificate of title. The defendants claim that the plaintiffs have no such certificates of title and, therefore, cannot claim a right to the motor vehicles in question.

While a certificate of title in the name of the plaintiffs would be conclusive proof of their ownership of the vehicles, such proof is not necessary for them to assert a claim of conversion against the defendants. This is especially true because not all of the leases in this case originated in Florida, and, as such, Florida's motor vehicle statutes may not apply. For the vehicle leases that did originate in this state, there is authority to support the conclusion that

the plaintiffs need not have certificates of title in their names to assert their conversion claim. In *Bunting v. Daly's Inc.,* 528 So.2d 106 (Fla. 4th DCA 1988), the court denied a defendant's motion for summary judgment because a substantial issue of material fact existed as to whether the purported owner of a truck actually owned the truck in question. The plaintiff in *Bunting* brought a conversion claim against a towing company that would not release the plaintiff's truck to him because the certificate of title was in the name of a third party. *See id.* at 107. The court rejected the towing company's defense based on section 319.22 of the Florida Statutes because the statute addresses only transfers of title and the acquisition of marketable title, not the mere transfer or passage of title. *See id.* at 108; *see also Florida Dept. of Corr. v. Blount Pontiac–GMC, Inc.,* 411 So.2d 930, 931 (Fla. 1st DCA 1982) (stating that Fla.Stat. § 319.22(1) does not prevent valid title from being passed, only marketable title). Accordingly, the court held that evidence aside from the certificate of title could be considered in support of the plaintiff's claim of ownership of the vehicle. *Bunting,* 528 So.2d. at 108; *see also In re Collins,* 151 B.R. 967, 970 (Bankr.M.D.Fla. 1993) (holding that car dealership was liable to floor plan financier for conversion of vehicles by failing to remit proceeds to financier); *Wilson v. Bankers Inv. Co.,* 47 So.2d 779 (Fla.1950) (holding defendants liable for conversion of automobile even though certificate of title was in defendant's name).

Assuming that section 319.22 was not limited to marketability of title, the plaintiffs still have a valid claim for conversion of the motor vehicles they have submitted uncontroverted evidence form which the court or a jury could infer that they have a valid claim to the vehicles. CIBC has possession of the original leases and the titles to the leased vehicles. *See* O'Keefe Affid. at ¶ 2. Also, CIBC has perfected its security interest by filing UCC–1 state-

ments. *See* Stern Affid. at ¶ 10, Ex. E. Finally, Finova, as the plaintiffs' agent, has possession of the original titles of the leases, which, in turn, are in the name of T & W. *See* Beck Affid. at ¶ 15. Even if the name on the certificates of title is not that of SPARC or CIBC, the evidence submitted by the plaintiffs shows that they at least have a right of possession superior to that of the defendants, which have introduced absolutely no documents or testimony to support their allegation that they have rightful possession of the vehicles and their proceeds. Accordingly, the court denies the defendants' motion for summary judgment on Count II of the plaintiff's complaint.

### III. Tortious Interference with Contractual and Business Relationships

Count III of the plaintiffs' amended complaint is for tortious interference with contractual and business relationships. A claim for interference with a contractual relationship requires: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach. *See Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir.1998) (listing elements). The requirements for the tort of interference with a business relationship are similar, except that a plaintiff need not establish the existence of a contract; he or she need only show the existence of a business relationship. *See Martin Petroleum Corp. v. Amerada Hess Corp.*, 769 So.2d 1105, 1107 (Fla. 4th DCA 2000) (listing elements); *Salit v. Ruden McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d 381, 385 (Fla. 4th DCA 1999) (same). Whether the defendant interferes with a contractual or business relationship, that defendant must be a third party or a stranger to the business relationship. *See Salit*, 742 So.2d at 386.

The defendants' first argument in support of their motion for summary judgment on Count III is that the plaintiffs cannot establish a contract with a third party with which the defendants have interfered nor that a third party breached such a contract as a result of the defendants' actions. The plaintiffs have responded by pleading and submitting as proof their Contracts Credit Agreement, which gave rise to a contractual relationship between the plaintiffs and T & W and the plaintiffs and Finova. Although the plaintiffs have not produced any contracts with lessees, they argue that such agreements exist. Because the defendants have not shown that these agreements are invalid or refuted allegations of their existence, the plaintiffs have established the first element of their tortious interference with a contractual relationship claim. They also have demonstrated that there are genuine issues of material fact as to whether the defendants prevented T & W, Finova, and the lessees from honoring their obligations under these agreements. The Contract Credit Agreement obligated T & W and, later, Finova to service the parties' contract. When the defendants began to service the Contract Credit Agreement to the exclusion of T & W and Finova and collected and retained lease proceeds that T & W or Finova should have remitted to the plaintiffs, they made it impossible for T & W and Finova to perform under the contract, essentially leading them to breach the Contracts Credit Agreement. Similarly, when the defendants informed the lessees not to transact any business with Finova and held themselves out as the servicers of the CIBC leases, they may have interfered with the lessee's obligations under their lease agreements. *See* Rosen Depo. at pp. 169–71; Peterson Depo. at pp. 42, 45, 51–52, 70–71; Roeser Affid., Ex. A, B, *see also Abele v. Sawyer*, 750 So.2d 70, 75 (Fla. 4th DCA 1999) (finding that plaintiff stated claim for tortious interference where defendant told third party that plaintiff had no authority to convert assets); *VG Sales Co. v. Tight*, 715

So.2d 977 (Fla. 4th DCA 1998) (finding that issues of fact precluded summary judgment on plaintiff's tortious interference claim where defendants threatened to call third parties to tell them not to use plaintiff's services).

■■■ The defendants' second argument is that their actions were justified because T & W has granted them powers of attorney to service the Contracts Credit Agreement. This contention is based on a recognized affirmative defense to claims for tortious interference with contractual and business relationships. *See Abele v. Sawyer,* 750 So.2d 70, 75 (Fla. 4th DCA 1999) (stating that justification or privilege to interfere with a contract is a defense to a tortious interference action). Florida courts have discussed this defense within a burden-shifting framework. That is, once a plaintiff has made a prima facie case of tortious interference with a business relationship, the burden shifts to the defendant to show that his interference was lawful. *See ISS Cleaning Svcs. Group, Inc. v. Cosby,* 745 So.2d 460, 462 (Fla. 4th DCA 1999) (discussing burden-shifting); *Unistar Corp. v. Child,* 415 So.2d 733, 734–35 (Fla. 3d DCA 1982) (same); *see also Florida Tel. Corp. v. Essig,* 468 So.2d 543, 544 (Fla. 5th DCA 1985) (finding that contractual provision granted defendant privilege to interfere, even if defendant was motivated by malicious intent).

The plaintiffs have submitted sufficient evidence to establish a genuine issue of material fact as to the validity, existence, and duration of the powers of attorney the defendants claim to possess. First, there is substantial grounds to doubt whether Paul Luke, who executed the powers of attorney, had the actual or apparent authority to grant the defendants the power to service the leases in question. *See* McCarthy Affid. at ¶ 22; Price Affid. at ¶ 14; Luke Depo at p. 94. Borzilleri's notice that T & W did not want the defendants to continue servicing the leases and that T & W did not believe the powers of attorney to be valid illustrates this point.

*See* Price Affid. at ¶ 15; Price Affid., Ex. D. Second, even if the powers of attorney were valid, they were terminated when T & W was replaced by Finova as the servicer of the leases and/or revoked when T & W's President informed Borzilleri that the powers of attorney had been revoked (if they were ever valid). *See* Price Affid. at ¶ 16, Ex. D. If accepted at trial as true, this evidence effectively would overcome the defendants' affirmative defense of privilege. Accordingly, the defendants' motion for summary judgment on Count III is denied.

## IV. The Claims Against Borzilleri In His Individual Capacity

The defendants request a dismissal of the complaint as filed against Borzilleri because they contend that he cannot be held liable in his individual capacity for the activities in which he engaged while working for Signature and Prime One. They argue that the plaintiffs have established no basis to justify the piercing of the veil of either company. The defendants' argument misconstrues the nature of the plaintiffs' complaint. They do not seek to hold Borzilleri liable under a veil-piercing theory, but because he personally participated in tortious conduct, namely conversion and interference with business and contractual relationships.

■■■ While it is true that a director or an officer is not personally liable for any act or failure to act regarding corporate management or policy, it does not follow that the officer or individual is shielded from accountability for tortious conduct. In fact, the opposite is true. Florida courts uniformly hold that if an officer, director, or agent commits or participates in a tort, whether or not his actions are by authority of the corporation or in furtherance of the corporate business, that individual will be liable to third persons injured by his actions, regardless of whether liability attaches to the corporation for the tort. *See First Fin. USA, Inc. v. Steinger,* 760 So.2d 996, 997–98 (Fla. 4th DCA 2000)

(holding that president of corporation was not shielded from liability for fraudulent conduct); *Scutieri v. Miller*, 605 So.2d 972, 973 (Fla. 3d DCA 1992) (holding that corporate officers could be liable for defamation even though claim against corporation had been settled). That is, officers, directors, and agents of a corporation can be personally liable for committing torts when the tort is committed within the scope of their corporate employment. For example, in *Dade Roofing and Insulation Corp. v. Torres*, 369 So.2d 98 (Fla. 3d DCA 1979), a Florida court reversed the entry of summary judgment in favor of the defendant (the president of a corporation) because that defendant personally participated in the conversion of trucks and roofing equipment. The court held that the defendant could be held liable individually, even though his corporation also was a defendant to the conversion claim. *See Dade Roofing and Insulation Corp.*, 369 So.2d at 99. In this case, the plaintiffs have alleged in their complaint and submitted evidence to create a genuine issue of material fact as to whether Borzilleri personally committed conversion and tortiously interfered with their contracts and business relationships. As a result, the defendants' motion to dismiss the claims as filed against Borzilleri is denied.

## V. Injunctive Relief

■ Count IV of the plaintiffs' amended complaint is a request for permanent injunctive relief. In order to obtain an injunction, a plaintiff must demonstrate: (1) a clear legal right; (2) inadequacy of a remedy at law; and (3) irreparable injury will occur if such relief is not granted. *See Glades Owners Ass'n, Inc. v. Prentiss*, 768 So.2d 1245 (Fla. 1st DCA 2000) (listing elements); *B.G.H. Ins. Synd., Inc. v. Presidential Fire & Casualty Co.*, 549 So.2d 197 (Fla. 3d DCA 1989) (stating that plaintiff must establish both irreparable harm and lack of adequate remedy at law). The

defendants argue that injunctive relief is not available to the plaintiffs because they cannot establish the second and third requirements for such relief.

■ The defendants' argument as to the third requirement—irreparable injury—is without merit. The plaintiffs have satisfied this element because irreparable injury is presumed in cases involving tortious interference with business relationships. *See Dotolo v. Schouten*, 426 So.2d 1013, 1015 (Fla. 2d DCA 1983) (holding that injunctive relief is only appropriate remedy in case involving wrongful interference with business relationship). In such cases, irreparable injury need not be alleged or proven. *See Unistar Corp. v. Child*, 415 So.2d 733, 735 (Fla. 3d DCA 1982) (holding that injunction was appropriate relief in cases involving tortious interference even though irreparable injury was neither alleged nor proven).

■ The plaintiffs also have satisfied the second requirement for obtaining injunctive relief. "Often times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable." *Lewis v. S.S. Baune*, 534 F.2d 1115, 1124 (5th Cir.1976)[6]; *cf. Morris Commun. Corp. v. PGA Tour, Inc.*, 117 F.Supp.2d 1322, 1330 (M.D.Fla.2000) ("To demonstrate irreparable harm, a plaintiff must show that it has no adequate remedy at law, meaning that its injury 'cannot be undone through monetary remedies'.") (citations omitted). This case presents such a situation because irreparable injury is the major basis for showing the inadequacy of a legal remedy. *See id.* By satisfying the irreparable injury requirement through their tortious interference claim, the plaintiffs also have shown the absence of an adequate legal remedy.

■ Even if the inadequacy of a legal remedy were not established in this case

---

**6.** The Eleventh Circuit adopted as binding precedent all cases decided by the former Fifth Circuit Court of Appeals prior to the close of business on September 30, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

through the irreparable harm requirement, the plaintiffs have alleged in their complaint and demonstrated a genuine issue of material fact as to the inadequacy of money damages. While it is true that the plaintiffs seek money damages in addition to injunctive relief, it does not automatically follow that by making such a request, they are precluded from seeking an injunction. *See Rubin v. Appel,* 194 So.2d 318, 319 (Fla. 3d DCA 1967) (stating that equity may award both injunction and damages). If the plaintiffs establish their conversion claims at trial, they will be able to recover money damages for the value of the lease proceeds and vehicles misappropriated by the defendants. They also may enjoin the defendants from continuing to solicit business from the plaintiff's lessee's and Finova's clients if they establish their tortious interference claims. Such a remedy may be proper in this case because the plaintiffs have created a genuine issue of material fact as to whether the defendants are likely to continue interfering with the plaintiffs' security interests and engaging in repeated violations of their rights to the collateral. If the court were to find otherwise, the plaintiffs would be compelled to bring a claim against the defendants each time they interfere with their protected rights in the future. Because the plaintiffs have shown that a legal remedy may be inadequate and the court presumes irreparable injury, the defendants' motion is denied as to Count IV. Accordingly, it is:

**ORDERED AND ADJUDGED THAT** the defendants' motion to dismiss or, in the alternative for summary judgment (DE ¶ 69) is DENIED WITHOUT PREJUDICE.